UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
\-------------------------------------------------------- X

VICTORIA WATERMAN,                                    :

                              Plaintiff,              :        **05 CV 2191**
                                                      :        **JUDGE LYNCH**
                                                      :
                                                      :
           -against-                                  :        **COMPLAINT**
                                                      :
                                                      :        **PLAINTIFF DEMANDS A**
REGISTER.COM, INC., OFFICETEAM, INC. and              :        **TRIAL BY JURY**
DANIEL SORAVILLA                                      :
                                                      :
                              Defendants.             :
\-------------------------------------------------------- X

Plaintiff, Victoria Waterman, by her attorneys, Levine & Blit, PLLC., and for her Complaint against Defendants Register.com, Inc. ("RCOM") OfficeTeam, Inc. ("OT"), and Daniel Soravilla ("Defendant Soravilla") alleges as follows:

<u>THE PARTIES</u>

1.        Plaintiff, Victoria Waterman, is a resident of the State of North Carolina residing at 6130 Red Cedar Drive, Apartment 2A, High Point, NC 27265.

2.        At all times relevant to the complaint at issues Ms. Waterman was a resident of the State of New York living at 1655 Flatbush Avenue Apt. C2101 Brooklyn, NY 11210.

3.        Ms. Waterman's race is African American.  Ms. Waterman is of Canadian and West Indian National origin.

4.        Ms. Waterman was employed by RCOM and OT (the "Defendants") in New York County, New York.

5.      Ms. Waterman worked as a Purchasing Agent and had responsibility for, *inter alia*, procuring technology equipment, working with vendors and processing invoices.

6.      RCOM is a publicly traded company listed on the NASDAQ.

7.      RCOM is a provider of global names registration, web hosting and other Internet services for businesses and customers.

8.      RCOM has an office at 575 Eighth Avenue, 11th Floor, New York, New York 10018, where Ms. Waterman was employed.

9.      OT is a placement agency and a division of Robert Half International.

10.     OT has an office at 245 Park Avenue, New York, New York 10017.

11.     Defendant Soravilla is employed by RCOM.

12.     Defendant Soravilla Ms. Waterman's direct Supervisor and served as Director of Operations and Services while Ms. Waterman was employed by RCOM and OT.

<u>THE NATURE OF THE ACTION</u>

13.     This is a civil action for damages and remedies brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 et seq. ("Title VII"); 42 U.S.C. §§1981 et seq. and the New York State Executive Law, as amended, §§ 290 et seq. ("New York State

Human Rights Law").

14.     Specifically, Defendants engaged in unlawful harassment and discriminated against Ms. Waterman because of her:

(a) sex, by subjecting her to a sexually harassing hostile work environment where unwelcome, inappropriate comments about sex and her sex life were frequent, severe and pervasive;

(b) race, by subjecting her to derogatory, threatening and offensive comments regarding the color of her skin, and offensive stereotypes regarding people of her race.   These comments were frequent, severe, pervasive and unwelcome;

(c) national origin, by subjecting her to derogatory, threatening and offensive comments related to Canadians and West Indians, with knowledge that Ms. Waterman was of Canadian and West Indian national origin.   These comments were frequent, severe, pervasive and unwelcome;

(d) Finally, Defendant's are guilty of unlawful retaliation, in that they, *inter alia*, increased the intensity of workplace harassment and later terminated Ms. Waterman because of her opposition to unlawful employment practices as described above and because of her continued efforts to report the above-referenced discrimination and harassment.

### JURISDICTION & VENUE

15.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

16.     Ms. Waterman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 30, 2004.

17.     On or about November 17, 2004, Ms. Waterman received a Notice of Right to Sue from the EEOC.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Ms. Waterman's claims occurred in the Southern District of New York.

<u>FACTS</u>

19.     Ms. Waterman began working for RCOM and OT on March 30, 2003, as a Purchasing Agent.

20.     Ms. Waterman's responsibilities included procuring technology equipment and supplies, working with vendors and processing invoices.

21.     Ms. Waterman was hired with the understanding that she would work for three months as an hourly employee, and would then become a full time employee of RCOM.

22.     Throughout the course of her employment with RCOM, Ms. Waterman was qualified for her position and performed her duties in a professional and competent manner

23.     On or about April 1, 2003, Ms. Waterman was notified that she would be reporting to Defendant Soravilla.

24.     Ms. Waterman was told, in particular, that Defendant Soravilla would supervise her work and assign her daily tasks.

25.     Ms. Waterman was further advised that she would be given qualified access, as Defendant Soravilla's subordinate, to his computer files.

26.      As early as June 3, 2003, Ms. Waterman was subjected to a grossly discriminatory environment which included vicious, unwelcome sexual harassment as well as constant attacks upon Ms. Waterman based upon her race, national origin and in retaliation for Ms. Waterman's opposition these discriminating employment practices and reporting efforts.

27.     On or about June 3, 2003, for example, Ms. Waterman's Supervisor, Defendant Soravilla, exposed her to derogatory and threatening racial insults.

28.     Specifically, Defendant Soravilla remarked that he was wearing loafers, and that a black man would not wear loafers.

29.     Upon information and belief this comment was meant to imply that African Americans were not capable of professional, polished dress.

30.     This remark was inappropriate and offensive to Ms. Waterman who objected to it.

31.     Despite this objection, Defendant Soravilla continued his offensive commentary, stated that any African American men who wore loafers were whiter than he was.

32.     On or about June 4, 2003, Defendant Soravilla insulted Ms. Waterman again, remarking that her hair was "nappy".  Ms. Waterman, along with another employee, stated that such a comment was inappropriate and particularly offensive to African Americans.

33.     Defendant Soravilla persisted in his harassing and demeaning commentary, however.  He stated, in fact, that Ms. Waterman's natural hairdo appeared unmanageable and that she should have her hair straightened to make it appear more European.

34.     This remark was egregiously offensive and derogatory and implied that African Americans were inferior to people of European descent.

35.     Ms. Waterman was hurt by the comment, but did not object as fiercely as she was inclined to because she wanted to keep her job.

36.     On or about June 23, 2003, Defendant Soravilla became outraged during a political conversation he had with a number of employees.  Ms. Waterman had a screensaver with a picture of Hillary Clinton, and Defendant Soravilla called her an idiot for liking the Senator.

37.     Upon information and belief, Defendant Soravilla's dislike of Hillary Clinton was based, in part, upon the fact that she is a successful woman.

38.     Defendant Soravilla stated that he could understand Ms. Waterman's misguided preference for Clinton because she was a Canadian.  Defendant Soravilla made remarks to the effect that "Canadians are America's bitches" and that "Canadians aren't all that bright".

39.     At this time Defendant Soravilla also remarked that stupid liberals were letting immigrants in and ruining the country.  In addition, he made derogatory comments about RCOM's foolish practice of hiring H1 Visa personnel.

40.     These comments were hostile, offensive and this egregious conduct unlawfully insulted Ms. Waterman based upon her Canadian national origin and status as an immigrant from Canada.

41.     Also on or about June 23, 2003, Defendant Soravilla, in the presence of Ms. Waterman and a Manager, remarked in a sexually harassing manner that he just loved watching a particular employee walk away.

42.     Upon information and belief this comment meant that Defendant Soravilla enjoyed looking at the employee's behind as she walked off and was unwelcome, harassing, threatening and offensive to Ms. Waterman.

43.     Also on or about June 23, 2003, Defendant Soravilla told an employee other than Ms. Waterman to take off her top to let him see if he could put it on.

44.     These comments, made by Defendant Soravilla, Ms. Waterman's Supervisor, were harassing, lewd, unwelcome, and made Ms. Waterman and others uncomfortable

in the workplace.

45.     Again, because Ms. Waterman needed her job, she was forced to endure the egregious harassment.

46.     On or about July 1, 2003, Defendant Soravilla again insulted and stereotyped African Americans in general and Ms. Waterman in particular, in telling Ms. Waterman that, with her head wrap, she looked like Aunt Jemima.

47.     This comment was egregiously offensive to Ms. Waterman as an African American woman because it informed Ms. Waterman that, according to her Supervisor, she was similar, in appearance and value, to a derogatory stereotype.  It further demonstrated Defendant Soravilla's racial bias towards Ms. Waterman an African Americans.

48.     Also on or about July 1, 2003, Defendant Soravilla approached Ms. Waterman and another employee and remarked that people in the office would start talking about the two of them having an affair because they always went out to lunch together.

49.     The employee Ms. Waterman was with stated that Ms. Waterman would never have an affair and that such a rumor would not circulate.  Defendant Soravilla remarked, however, that he might just start the rumor himself and laughed.

50.     The sexually suggestive comments and threats, made again by Ms. Waterman's Supervisor and in the presence of a co-worker were unwelcome, and made Ms. Waterman feel cheap and sexually harassed in the workplace.

51.     Upon information and belief, none of the employees or management of RCOM who were present during the afore-mentioned harassment took any significant step to stop the comments.

52.     In fact, despite Ms. Waterman's previous verbal protests to the harassing and discriminatory conduct, none of the employees or management of RCOM or OT made any efforts to apologize to Ms. Waterman or to advise her of the appropriate steps she could take to report the harassment so that it might be remedied.

53.     On or about July 9, 2003, Ms. Waterman had endured too much harassment, and decided to take the next step by formalizing the process.

54.     On or about that date Ms. Waterman complained in writing about the harassment and hostile environment she was being subjected to. Though she feared that she might be jeopardizing her job security, Ms. Waterman sent an e-mail to RCOM Property Manager Lee Borom complaining about the disturbing and distracting behavior of one of the RCOM employees.

55.     Ms. Waterman received no response or assistance as a result of this e-mail.

56.     On or about July 28, 2003, Ms. Waterman sent yet another e-mail to RCOM Property Manager Lee Borom, this time more specifically citing to the handbook procedures being violated by RCOM employees including her Supervisor, Defendant Soravilla.

57.     In this e-mail, Ms. Waterman reported that one employee sexually and racially harassed her by stating, in relevant part, that she looked like the kind of person who would wait after hours at a Dunkin Donuts.

58.     Upon information and belief such statement inappropriately stereotyped Ms. Waterman as poor, overweight, sexually promiscuous African American.

59.     Also in her July 28, 2003 reporting e-mail to RCOM Property Manager Lee Borom, Ms. Waterman commented that one of her colleagues and Defendant Soravilla openly discussed their sexual exploits at work.

60.     In particular, she indicated that one employee asked Defendant Soravilla if he bagged any shorties while he was on vacation.

61.     Upon information and belief, this question was posed to determine whether or not Defendant Soravilla had sexual intercourse while on vacation.

62.     Also in her July 28, 2003, reporting e-mail Ms. Waterman remarked that when she approached the above-referenced offending employee about the offensive nature of his comments he responded to her concerns with verbal threats, vulgar language and physical threats.

63.     On July 28, 2003, Property Manager Lee Borom sent an e-mail to Ms. Waterman stating that he would address Ms. Waterman's concerns immediately.

64.     The action Property Manager Lee Borom took, if any, was clearly not

helpful to Ms. Waterman as the egregious harassment continued.

65.    On or about July 28, 2003, Ms. Waterman forwarded a copy of the reporting e-mail to Debra Hayme, Staffing Manager at OT.

66.    On information and belief OT provided no remedy for the harassment.

67.    On or about July 29, 2003, Ms. Waterman forwarded her reporting e-mail to Sharon Barnett, an employee of the Human Resources department at RCOM.

68.    There was no response to this e-mail.

69.    On July 30, 2003, Ms. Waterman sent yet another e-mail to Sharon Barnett seeking to confirm that she received the earlier notice – since Sharon Barnett had not responded to it.

70.    A copy of this second e-mail was sent to RCOM Director of Human Resources Allison Grace just to make sure the harassment would be addressed.

71.    The action Sharon Barnett and Allison Grace took, if any, was clearly not helpful to Ms. Waterman as the discrimination and harassment continued and even intensified.

72.    On or about July 30, 2003, for example, Ms. Waterman was confronted by Defendant Soravilla regarding her second complaint.

73.     Defendant Soravilla told Ms. Waterman, in response to her compliant, that she should be grateful and flattered that colleagues made sexist comments about the size of her buttocks.

74.     Ms. Waterman was insulted by this egregiously harassing and insensitive response from Defendant Soravilla, her RCOM Supervisor.

75.     Nevertheless, Ms. Waterman tried to emphasize the severity of the problem to Defendant Soravilla, and indicated that RCOM employees, including Defendant Soravilla, did not make only sexually offensive comments.

76.     Ms. Waterman also informed Defendant Soravilla, in fact, that one employee also made threatening and inappropriate comments regarding a gun he had.

77.     Defendant Soravilla told Ms. Waterman that the threatening employee was just a typical black male.  Defendant Soravilla stated that, as such, this employee was not to be taken seriously but was only to be considered funny entertainment

78.     Defendant Soravilla concluded his response to Ms. Waterman's complaint by dismissing it and stating that the threatening comments about a gun did not mean anything.

79.     The above-referenced racial insults of Defendant Soravilla were severe, offensive, unwelcome and consistent with his pattern or derogatory treatment and behavior towards African Americans at RCOM.

80.     The comments convinced Ms. Waterman that her Supervisor would not stop his racial harassment and discrimination or stop the harassing and discriminatory conduct of others.

81.     Defendant Soravilla's insensitivity to Ms. Waterman's concerns, moreover, made Plaintiff feel that her reporting was useless, and that if she made additional reporting efforts she might be retaliated against and her job might be in jeopardy.

82.     Defendant RCOM's Equal Employment Opportunity and Unlawful Harassment Policy provides that "Each employee will be responsible for complying with both the spirit and letter of this policy.  Any employee who feels they have been harassed should promptly notify their Supervisor or someone in the Human Resources Department".

83.     While Ms. Waterman complied with all aspects of this reporting procedure as early as July 9, 2003, by notifying her Supervisor and, later in July the RCOM Human Resources Department, no change in the workplace was made.  In fact, Defendant Soravilla and the other employees, following his lead, intensified their discrimination and harassing conduct and comments towards Ms. Waterman .

84.     In fact, no steps were taken by RCOM to prevent or stop the severe, pervasive and unwelcome harassment which Ms. Waterman was being subjected to on almost a daily basis.

85.     OT's Harassment Policy states that "the policy of office team is to provide a work environment that is free of all impermissible forms of harassment … Any employee,

13

candidate or contractor who feels that she or he has been the subject of harassment … may call their staffing Manager who will then take appropriate action.

86.    Ms. Waterman e-mailed her staffing Manager Debra Hayme at OT about the horrible workplace conditions she was being subjected to on July 28, 2003.

87.    Upon information and belief appropriate steps were not taken by OT to prevent or stop the severe, pervasive and unwelcome harassment Ms. Waterman was being subjected to.

88.    On or about August 6, 2003, Ms. Waterman was subjected to further retaliation for her reporting efforts.

89.    On that occasion Defendant Soravilla, told Ms. Waterman that he knew about her reporting efforts.

90.    Defendant Soravilla told Ms. Waterman that her future with RCOM was at stake and that the salary he discussed with her would change because things had changed

91.    Defendant Soravilla further stated that Plaintiff should be very careful about accusing people that work with the Human Resources Department.

92.    Defendant Soravilla stated that if Ms. Waterman wanted to get ahead reporting harassment was not the way to do so.

93.     Defendant Soravilla stated that the salary Ms. Waterman would eligible for would now be in the $40,000 range and not in the $60,000 range.

94.     This change was clearly in retaliation for Ms. Waterman's reporting and was designed to deter any additional reporting efforts.

95.     On the same occasion, Defendant Soravilla also informed Ms. Waterman that if she continued to complain about harassment she might end up like Monique Brackett.

96.     Defendant Soravilla told Ms. Waterman that Monique Brackett worked for RCOM, complained about her boss, and was fired.

97.     Defendant Soravilla remarked that the termination of Monique Brackett was covered-up as a downsizing resulting from department consolidation.

98.     Ms. Waterman was threatened by this comment and believed it was designed to discourage and intimidate her from making additional claims of harassment and to make her believe that if she continued to complain or report she would loose her job.

99.     Defendant Soravilla dangled the prospect of an assignment to a job with a substantial pay increase with full benefits over Ms. Waterman to intensify the power of his threat.

100.    Ms. Waterman also believed this comment was in retaliation for Ms. Waterman's initial reporting efforts.

101.     On or about August 21, 2003, Defendant Soravilla began making violent, hostile comments about his hatred for Hillary Clinton.  Defendant Soravilla specifically remarked that he would like to pump six bullets into Hillary Clinton.

102.     Defendant Soravilla further remarked that if he ever saw Hillary and Bill Clinton on the sidewalk he would douse them with gasoline and light them on fire.  Defendant Soravilla stated that he would do this because he hated liberals.

103.     Defendant Soravilla also said that he would take out his penis and piss on Mr. and Mrs. Clinton.

104.     Defendant Soravilla further remarked that the United States should deport all immigrants and drop a bomb over Pakistan.

105.     This statement was threatening and offensive to Ms. Waterman as a person of West Indian and Canadian national origin and as an immigrant.

106.     On or about September 2, 2003, Defendant Soravilla again engaged in harsh, derogatory and offensive commentary regarding African Americans.

107.     Defendant Soravilla specifically remarked that Ms. Waterman's people, meaning African Americans, could not properly celebrate during the holidays.  Defendant Soravilla stated, in fact, that African Americans killed each other on the sidewalks instead.

108.     This remark of Defendant Soravilla's was specifically made in reference to

16

the West Indian Day Parade, which Ms. Waterman said she enjoyed, and which is held on Eastern Parkway during Labor Day.

109.    On or about the same date Defendant Soravilla stated that he would not want to be around Jamaicans because all they do is get high.

110.    Ms. Waterman was obviously threatened and hurt by these horribly offensive racist comments and by the violence of Defendant Soravilla.

111.    On September 10, 2003, Ms. Waterman sent yet another reporting e-mail to OT regarding her interactions with Defendant Soravilla.   This e-mail specifically referred to Defendant Soravilla's abusive behavior and included references to his "syllabic banging on the desk, swearing and yelling".

112.    OT took no steps to intervene or correct this clearly significant, abusive workplace issue despite the second notice.

113.    On or about September 10, 2003, Ms. Waterman found that someone had placed a Canadian flag upon her desk.

114.    Defendant Soravilla found the flag and threatened to light it on fire.   At this time Defendant Soravilla again remarked that Canada was America's bitch.

115.    These comments and actions by Defendant Soravilla, Ms. Waterman's Supervisor, insulted and threatened Ms. Waterman because of her Canadian national origin and took place in front of other RCOM employees making the entire workplace horribly stressful.

116.     These comments were also symptomatic of the increasingly violent aspect to the discrimination Ms. Waterman was being subjected to.

117.     On September 11, 2003, in another effort to prevent severe workplace hostility she was being exposed to, Ms. Waterman approached her Supervisor, Defendant Soravilla, because the comments of two of her colleagues were bothering her.

118.     Upon information and belief Ms. Waterman approached Defendant Soravilla again because she wanted to keep her job and because her efforts to report to others had no effect.

119.     In particular, Ms. Waterman told Defendant Soravilla the employees were unremitting in their offensive and harassing comments about her ethnic or black hair.

120.     In response to Ms. Waterman's complaint, Defendant Soravilla took no action.  In fact, Defendant Soravilla dismissed Ms. Waterman's concerns and told Ms. Waterman that she should just relax, because the work environment at RCOM was very relaxed.

121.     On or about September 11, 2003, a Senior Network Engineer altered a cartoon of an African American woman on a website.  In particular, the engineer added cotton to the Afro that the cartoon character had and showed it to Ms. Waterman and other employees.

122.     Ms. Waterman was harassed and offended by this action as it reflected on the times in America when African American slaves were forced to work in cotton fields.

123.     This act by yet another RCOM employee exacerbated the strains of the horribly discriminatory environment Ms. Waterman was being exposed to.

124.     Ms. Waterman's Supervisor, Defendant Soravilla took no steps to stop, report or prevent this harassment though he was aware of it.

125.     In the middle of September 2003, a Senior Network Engineer further exacerbated the discriminatory workplace environment by making lewd and offensive comments to Ms. Waterman.

126.     These comments included racially and religiously offensive stereotypes. For example, the employee commented:

(a) That Ms. Waterman's African American hair made her look like Sideshow Bob from the cartoon show The Simpsons;

(b) The people on the subways are all ghetto, and there are towels wrapped around every head;

(c) My neighborhood is great.  I have a Christian phone book and there are no Jews allowed;

(d) A good neighborhood consists of Christian men and women.

127.     These statements were made in the presence of a Manager, Ms. Waterman's Supervisor Defendant Soravilla, and several other employees.

128.     On or about September 18, 2003 RCOM employees attacked Ms. Waterman about her Afro and the ways a pen could get stuck in it.

129.     These attacks were severe, racist, harassing and hurtful to Ms. Waterman as an African American.

130.     None of the afore-mentioned Supervisors or employees made any attempts to stop or report this harassing conduct.

131.     In September or October of 2003, Ms. Waterman took additional steps to escalate her complaint to higher authorities.

132.     In particular, Ms. Waterman Instant Messaged ("IM") Defendant Soravilla's Supervisor and RCOM's Chief Technology Officer, Walt Meffert ("Meffert" or "Officer Meffert").

133.     The IM requested that Officer Meffert intervene on Ms. Waterman's behalf in stopping Defendant's Soravilla's harassment.

134.     Meffert initially told Ms. Waterman "no".

135.     Ms. Waterman made it clear to Officer Meffert that she tried to address the matter directly with Defendant Soravilla, but was unsuccessful.

136.     Officer Meffert inquired as to whether Ms. Waterman was serious.

137.     Ms. Waterman told Meffert that the harassment kept happening.

138.     Meffert then stated that Ms. Waterman should talk to him on Tuesday.

139.     Meffert explained that he did not want to handle the matter on IM.

140.     Upon information and belief Officer Meffert did not come to the office on Tuesday and did not address Ms. Waterman's complaint to her when he did return.

141.     In fact, upon information and belief Ms. Waterman and Meffert never met, Defendant Soravilla was never addressed regarding this complaint, and the harassment continued.

142.     On or about October 7, 2003, Ms. Waterman and a number of other co-workers complained that they were cold because the air conditioner was on.

143.     Defendant Soravilla loudly remarked, specifically to Ms. Waterman and in an offensive, unwelcome and demeaning manner, that if she did not come into the office dressed like a stripper she would not be so cold.

144.     Defendant Soravilla, at this time, also called Ms. Waterman a snobby bitch.

145.     This blunt and aggressive attack was made in the presence of other

employees and was consistent with the demeaning and egregious, sexually harassing conduct pervasive in the workplace.

146.     On the same date, Defendant Soravilla remarked in front of other employees that Ms. Waterman was in a pissy mood and needed to get some, implying that she needed to have sexual intercourse.

147.     This remark was unwelcome, offensive and demeaning to Ms. Waterman.

148.     Despite these hostile, demeaning and inappropriate comments, no steps were taken to prevent or report this conduct.

149.     On October 31, 2003, a Senior Network Engineer at RCOM observed an employee's daughter and remarked that she was nice and light.  The employee highlighted the discriminatory and threatening nature of the comment, which was offensive to Ms. Waterman, by saying that he did not like dark people.

150.     Ms. Waterman was understandably insulted and threatened by the comment and it demonstrated to her that yet another employee at RCOM endorsed and subscribed to the bigotry and hatred pervasive in her workplace.

151.     On the same date, Defendant Soravilla remarked that Ms. Waterman's skin was not nice in comparison to the lighter skin of Jasmine - the character from the cartoon movie Aladdin.

152.     On or about November 10, 2003, Ms. Waterman handed Defendant Soravilla some invoices he needed to sign.  Defendant Soravilla signed the invoices and then threw the invoices back at Ms. Waterman, forcing her to bend down and pick them up.

153.     This act was violent, sexually harassing and degrading to Ms. Waterman.

154.     The act was consistent with the severe and pervasive hostile work environment Ms. Waterman was forced to endure.

155.      On or about November 4, 2003, Defendant Soravilla made harassing and derogatory jokes about West Indian Culture, with knowledge that Ms. Waterman was of West Indian descent

156.     On or about the same date, Ms. Waterman brought her lunch, a chicken patty, back into the office.

157.     Defendant Soravilla commented that West Indian food sucked.  Defendant further stated that West Indian's weren't exactly great cooks.

158.     These derogatory and offensive comments were made in the presence of other employees and were unwelcome, discriminatory and offensive to Ms. Waterman as a person of West Indian national origin.

159.     Also in November, on or about Peter Forman's Birthday, Defendant Soravilla continued to make severely inappropriate, unwelcome sexually harassing comments and

continued to take actions that created a hostile work environment.  These actions included:

(a) Stating that one employee was his office wife, and suggesting that he had sex with her and that she had a bright future with RCOM because of this;

(b) Stating that another employee was his thing on the side, suggesting that he had sex with her as well;

(c) Sticking his behind in one employees face to force her to move, and telling her that if she did not move he would report her to Officer Meffert;

(d) Stating that he was in love with one employee and that he had a crush on her.

160.    These comments were unwelcome, sexually harassing and offended Ms. Waterman.

161.    The comments were made boldly and aggressively and were symptomatic of the increasing intensity of the harassment Ms. Waterman was forced to endure.

162.    Employees, other that Ms Waterman, were party to these comments, yet nothing was done to prevent the harassment.

163.    On or about November 19, 2003, Defendant Soravilla continued his harassing conduct in addressing Ms. Waterman.  On that date, Defendant Soravilla accused Ms. Waterman of having sexual relations with a colleague.

164.    In particular, Defendant said words to the effect of "you are fucking him aren't you?" and "you are a slut".

165.    Defendant Soravilla then corrected his comment, stating that he did not think Ms. Waterman had fucked the colleague, because if she had, the colleague would not still be coming around.

166.    These comments were offensive, unwelcome and hurt and demeaned Ms. Waterman as a woman.  They were also, again, made boldly.

167.    On or about November 21, 2003, Defendant Soravilla made additional sexually suggestive comments about Ms. Waterman's relationship with the colleague in question.

168.    Defendant Soravilla gave Ms. Waterman a box of rubber bandages that looked like small condoms and remarked that Ms. Waterman could use them with her boyfriend.

169.    Ms. Waterman was insulted and outraged by this action, and a colleague of Ms. Waterman's challenged Defendant Soravilla for making his inappropriate comments - especially as the Manager.

170.    Defendant Soravilla was not concerned by this comment and reference to his obligations - he laughed.

171.    On or about November 24, 2003, Defendant, again in the presence of

several employees, made a derogatory, racist comment about Ms. Waterman's natural black hair. Defendant also criticized Ms. Waterman's head wrap.

172.　　On or about November 25, 2003, a Manager at RCOM approached Ms. Waterman and commented on her screensaver.  The screensaver was a poem by Maya Angelou called "Phenomenal Woman".

173.　　The Manager remarked that he did not understand why women have to have poems and men do not.

174.　　Ms. Waterman attempted to explain the poem, but was interrupted by Defendant Soravilla who stated that the poem was written by a man-hating lesbian bitch.

175.　　Ms. Waterman continued to explain the poem and Defendant Soravilla continued to discuss, over her, man-hating lesbians.

176.　　Ms. Waterman was insulted and offended by the Manager's comment about woman needing poems because it was a sexist statement.

177.　　It again conveyed to her that yet another employee in a supervisory capacity was bigoted and hated her based upon her sex.

178.　　Defendant Soravilla's comments about man hating lesbians were similarly offensive, unwelcome and egregious.

179.     On the same date Ms. Waterman was told by Defendant Soravilla that she would never be employee of the month.

180.     This comment was clearly in retaliation for Ms. Waterman's efforts to report to the harassment she was enduring.

181.     Ms. Waterman, nevertheless, pointed out to Defendant Soravilla that many employees arrive later than her, but that she was the only employee harassed for lateness.

182.      On or about November 26, 2003, a Manager began a discussion of the spelling of the word "laid" with an employee.  The employee believed the word was spelled "layed" and was corrected.

183.     The same Manager also began criticizing Ms. Waterman about her spelling of certain words.

184.     Ms. Waterman tried to explain her mistakes, by stating that certain words, like "neighborhood" include a "u" in Canada.

185.     The Manager insisted that Ms. Waterman's spelling was just wrong, and Defendant Soravilla stated that if Ms. Waterman wanted to spell like she was in Canada she should go back to Canada.

186.     As the discussion continued Defendant Soravilla again began harassing Ms. Waterman about her national origin, stating that Canadians were backwards people and that

Canada was the fifty-first state in the United States because the United States controlled Canada.

187.    Defendant Soravilla also remarked that Canadians were dumb because they still reported to the Queen.

188.    Ms. Waterman was insulted by these unwelcome attacks on her national origin – both of which were made by two RCOM employees with supervisory roles.

189.    On or about the same date, Defendant Soravilla told Ms. Waterman that in Union times she would be shot and killed for her reporting efforts because she would be considered an enemy of Corporate America.

190.    Ms. Waterman mentioned to Defendant Soravilla that she had an aunt who worked for the Human Rights Commission in Nova Scotia, and that the company could get in trouble for the things he did.

191.    Defendant Soravilla stated that Ms. Waterman's aunt would be shot and killed if she ever tried to do anything because before RCOM there was nothing.

192.    Ms. Waterman found these comments offensive and threatening.   The violence in the threats was terrifying.

193.    Ms. Waterman was exhausted by the attacks she was constantly being subjected to based upon her national origin, sex, race and in retaliation for her objections to the discriminatory treatment.  She was too threatened to believe that she could report to work any longer

without significant risk.

194.    As a result, on or about December 2, 2003, Ms. Waterman directly contacted OT again and repeated her complaints about the harassment and problems she was having at RCOM.

195.    There was finally a response.

196.    Division Director of OT, Nick Saricopoulos advised Ms. Waterman that he would look into her allegations.

197.    On or about December 3, 2003, Nick Saricopoulos contacted Human Resource Director Allison Grace at RCOM regarding Ms. Waterman's complaint.

198.    On or about December 5, 2003, Allison Grace advised Nick Saricopoulos that she did not want Ms. Waterman to return to RCOM while her investigation was pending.

199.    This action, in and or itself, was improper and retaliatory.

200.    On December 8, 2003, Allison Grace interviewed Ms. Waterman regarding her complaint.

201.    Ms. Waterman provided Allison Grace with the details of her harassment and identified numerous people for Allison Grace to interview.

202.     On December 19, 2003, Allison Grace met with Ms. Waterman again.  Ms. Grace indicated that she had concluded her investigation and that several parties were at fault.

203.     Consistent with this conclusion, both OT and RCOM admitted in their respective position statements that Ms. Waterman was subjected to inappropriate, harassing comments.

204.     RCOM's position statement in particular states that Ms. Waterman was subjected to, *inter alia*, racial and ethnic slurs, lewd sexually oriented comments, foul and obscene language, and sexually explicit remarks including references to sexual conduct.

205.     Amazingly, however, Allison Grace informed Ms. Waterman, along with OT Division Director Nick Saricopoulos, that because of Ms. Waterman's actions, she was to be terminated.

206.     Upon information and belief no other parties to this horribly discriminatory work environment were discharged or even suspended, though Allison Grace said that others were at fault.

207.     Upon information and belief, Ms. Waterman's former Supervisor, Defendant Soravilla, is still employed at RCOM as are many of the other employees who created the discriminatory and sexually harassing environment Ms. Waterman was subjected to.

208.     As a result, Ms. Waterman's final efforts to report and prevent the continued severe and pervasive workplace harassment based upon her race, national origin, color

and sex resulted in a retaliatory termination.

209.    Any explanation offered by either Defendant is a pretext for discrimination.

210.    Ms. Waterman has seen a psychologist and has received treatment for the mental and emotional distress caused by the circumstances above.

## FIRST CAUSE OF ACTION AGAINST REGISTER.COM
### (Sex Discrimination in Violation of Title VII)

211.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 198 as if separately set forth herein.

212.    At all relevant times, Ms. Waterman was an "employee" of RCOM for purposes of Title VII.

213.    Upon information and belief, RCOM is an "employer" for purposes of Title VII.

214.    Defendants RCOM took tangible employment actions against Ms. Waterman, including terminating her, and permitting Defendant Soravilla to threaten and consistently sexually harass Ms. Waterman.

215.    Defendant Soravilla had the authority to alter the terms, conditions and privileges of Ms. Waterman's employment as her immediate Supervisor. For example, Defendant Soravilla would assign Ms. Waterman work and provide feedback and evaluations of such work.

216.    In addition, Defendant Soravilla had power, by virtue of this evaluative position, to determine when she might be hired on full time and what salary she might earn at that time.

217.    Ms. Waterman endured sexual insults, questioning and harassment from Defendant Soravilla that were unwelcome, severe, pervasive, regular, repeated, and continuous.

218.    Defendant Soravilla's sexual comments, both to Ms. Waterman and to her co-workers, permeated Ms. Waterman's work environment with discriminatory sexual harassment.

219.    This harassment detrimentally affected Ms. Waterman, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

220.    A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

221.    Defendant Soravilla's ongoing harassment of Ms. Waterman because of her sex constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

222.    The acts complained of herein also constitute a continuing violation because Defendant RCOM had notice and knowledge of Defendant Soravilla's harassment of Ms.

Waterman, and other women at Defendant RCOM's workplace, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

223.    Accordingly, Ms. Waterman's Complaint challenges all discriminatory conduct and harassment by Defendant Soravilla and other supervisory employees (and imputed to the Defendants RCOM) as part of the violations complained of herein.

224.    Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant RCOM by reporting that harassment to her immediate Supervisor Defendant Soravilla, and to both Sharon Barnett and Allison Grace of the Human Resources Department at RCOM.

225.    Defendant RCOM failed to exercise reasonable care to prevent and correct promptly the harassment including Defendant Soravilla's sexually harassing behavior.

226.    Defendant RCOM's actions constitute discrimination against Ms. Waterman because of her sex with respect to the terms, conditions, and privileges of her employment, in violation of Title VII.

227.    The reason or reasons given by Defendant RCOM for terminating Ms. Waterman are a pretext for sex discrimination.

228.    As a result of defendant RCOM's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

229.     Since Defendant RCOM engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

<u>**SECOND CAUSE OF ACTION AGAINST REGISTER.COM**</u>
**(Race Discrimination in Violation of Title VII)**

230.     Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 217 as if separately set forth herein.

231.     Defendants RCOM took tangible employment actions against Ms. Waterman, including terminating her, and consistently subjecting her to egregiously derogatory harassment based upon her race in violation of Title VII.

232.     Ms. Waterman endured racial insults from numerous RCOM employees, including her Supervisor Defendant Soravilla, that were unwelcome, severe, pervasive, regular, repeated, and continuous.

233.     This racial harassment detrimentally affected Ms. Waterman, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

234.     A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

235.    RCOM's ongoing harassment of Ms. Waterman because of her race constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

236.    The acts complained of herein also constitute a continuing violation because Defendant RCOM had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

237.    Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant RCOM by reporting the racial harassment to her immediate Supervisor Defendant Soravilla, and to both Sharon Barnett and Allison Grace of the Human Resources Department at RCOM.

238.    Defendant RCOM failed to exercise reasonable care to prevent and correct promptly the harassment.

239.    The reason or reasons given by Defendant RCOM for terminating Ms. Waterman are a pretext for race discrimination.

240.    As a result of defendant RCOM's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

241.    Since Defendant RCOM engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION AGAINST REGISTER.COM
### (National Origin Discrimination in Violation of Title VII)

242.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 230 as if separately set forth herein.

243.    Defendants RCOM took tangible employment actions against Ms. Waterman, including terminating her, and consistently subject her to egregiously derogatory harassment based upon her Canadian and West Indian national origin in violation of Title VII.

244.    Ms. Waterman endured unwelcome, egregious and harassing comments from numerous RCOM employees relating to the fact that she came from Canada and was of West Indian decent that were unwelcome, severe, pervasive, regular, repeated, and continuous.

245.    This harassment based upon Ms. Waterman's national origin detrimentally affected Ms. Waterman, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

246.    A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

247.     RCOM's ongoing harassment of Ms. Waterman because of her national origin constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

248.     The acts complained of herein also constitute a continuing violation because Defendant RCOM had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

249.     Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant RCOM by reporting the discrimination to her immediate Supervisor Defendant Soravilla, and to both Sharon Barnett and Allison Grace of the Human Resources Department at RCOM.

250.     Defendant RCOM failed to exercise reasonable care to prevent and correct promptly the harassment.

251.     The reason or reasons given by Defendant RCOM for terminating Ms. Waterman are a pretext for national origin discrimination.

252.     As a result of defendant RCOM's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

253.     Since Defendant RCOM engaged in discriminatory practices with malice

or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

<u>**FOURTH CAUSE OF ACTION AGAINST REGISTER.COM**</u>
**(Retaliation in Violation of Title VII)**

254.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 242 as if separately set forth herein.

255.    By the conduct alleged in paragraphs 12-198 Defendants RCOM took tangible employment actions against Ms. Waterman, including terminating her, and consistently subject her to egregiously derogatory harassment for her opposition to unlawful employment practices, namely the ongoing discrimination against her in violation of 42 U.S.C. 2000e-3.

256.    Ms. Waterman endured insults from numerous RCOM employees, including Defendant Soravilla, because of her reporting efforts.  The acts complained of herein also constitute a continuing violation because Defendant RCOM had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice..

257.    Defendant RCOM failed to exercise reasonable care to protect Ms. Waterman from such retaliation.

258.    The reason or reasons given by Defendant RCOM for terminating Ms. Waterman are a pretext for retaliation.

259.     As a result of defendant RCOM's unlawful retaliation, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

260.     Since Defendant RCOM engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION AGAINST REGISTER.COM**
**( Race Discrimination in Violation of 42 U.S.C. 1981 Against Register.Com)**

261.     Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 249 as if separately set forth herein.

262.     Ms. Waterman is an African American presently and at all time relevant to this complaint, residing within the jurisdiction of the United States of America.

263.     Ms. Waterman was regularly and egregiously harassed and insulted based upon her race by her Employer, RCOM.  Such harassment was unwelcome.

264.     Ms. Waterman was subjected to these harassing terms and terminated based upon her race in violation of 42 U.S.C. 1981.

265.     A reasonable person would have found the race-based harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and

abusive.

266.    Accordingly, Ms. Waterman's Complaint challenges all discriminatory conduct and harassment by Defendant Soravilla and other RCOM employees (and imputed to the Defendants RCOM) as part of the violations complained of herein.

267.    Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant RCOM by reporting that harassment to the requisite parties named above on a number of occasions.

268.    As a result of Defendant RCOM's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

269.    Since Defendant RCOM engaged in and condoned discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## FIRST CAUSE OF ACTION AGAINST OFFICETEAM
### (Sex Discrimination in Violation of Title VII)

270.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 258 as if separately set forth herein.

271.    At all relevant times, Ms. Waterman was an "employee" of OT for purposes of Title VII.

272.     Upon information and belief, OT is an "employer" for purposes of Title VII.

273.     Defendants OT took tangible employment actions against Ms. Waterman, including terminating her, and permitting Defendant Soravilla to threaten and consistently sexually harass Ms. Waterman.

274.     Defendant Soravilla and Defendant OT had the authority to alter the terms, conditions and privileges of Ms. Waterman's employment as her immediate Supervisor. For example, Defendant Soravilla would assign Ms. Waterman work and provide feedback and evaluations of such work.  Defendant OT could terminate Ms. Waterman at any time.

275.     In addition, Defendants Soravilla and OT had power, by virtue of their evaluative positions, to determine when she might be hired on full time and what salary she might earn at that time.

276.     Ms. Waterman endured sexual insults, questioning and harassment from Defendant Soravilla that were unwelcome, severe, pervasive, regular, repeated, and continuous.

277.     Defendant Soravilla's sexual comments, both to Ms. Waterman and to her female co-workers, permeated Ms. Waterman's work environment with discriminatory sexual harassment.

278.     This harassment detrimentally affected Ms. Waterman, and was sufficiently

severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

279.     A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

280.     Defendant Soravilla's ongoing harassment of Ms. Waterman because of her sex constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

281.     The acts complained of herein also constitute a continuing violation because Defendant OT had notice and knowledge of Defendant Soravilla's harassment of Ms. Waterman, and other women at Defendant OT's workplace, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

282.     Accordingly, Ms. Waterman's Complaint challenges all discriminatory conduct and harassment by Defendant Soravilla (and imputed to the Defendants OT) as part of the violations complained of herein.

283.     Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant OT by reporting that harassment to her immediate Supervisor Defendant Soravilla, and to both OT Staffing Manager Debra Hayme and Division Director Nick Saricopoulos.

284.     Defendant OT failed to exercise reasonable care to prevent and correct promptly the harassment including Defendant Soravilla's sexually harassing behavior.

285.     Defendant OT's actions constitute discrimination against Ms. Waterman because of her sex with respect to the terms, conditions, and privileges of her employment, in violation of Title VII.

286.     The reason or reasons given by Defendant OT for terminating Ms. Waterman's assignment at RCOM are a pretext for sex discrimination.

287.     As a result of defendant OT's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

288.     Since Defendant OT engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION AGAINST OFFICETEAM
### (Race Discrimination in Violation of Title VII)

289.     Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 277 as if separately set forth herein.

290.     Defendants OT took tangible employment actions against Ms. Waterman, including terminating her, and consistently subject her to egregiously derogatory harassment based

upon her race in violation of Title VII.

291.    This racial harassment detrimentally affected Ms. Waterman, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

292.    A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

293.    OT's ongoing harassment of Ms. Waterman because of her race, and OT's lack of responsiveness in response to Ms. Waterman's complaint constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

294.    The acts complained of herein also constitute a continuing violation because Defendant OT had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

295.    Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant OT by reporting the racial harassment to her immediate Supervisor Defendant Soravilla, and to both OT Staffing Manager Debra Hayme and Division Director Nick Saricopoulos.

296.    Defendant OT failed to exercise reasonable care to prevent and correct

promptly the harassment.

297.    The reason or reasons given by Defendant OT for permitting the termination of Ms. Waterman are a pretext for race discrimination.

298.    As a result of defendant OT's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

299.    Since Defendant OT engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION AGAINST OFFICETEAM
### (National Origin Discrimination in Violation of Title VII)

300.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 288 as if separately set forth herein.

301.    Defendants OT took tangible employment actions against Ms. Waterman, including permitting her termination and consistent exposure to egregiously derogatory harassment based upon her national origin in violation of Title VII.

302.    Ms. Waterman endured severe, harassing and demeaning insults from numerous RCOM employees relating to the fact that she came from Canada and was of West Indian decent that were unwelcome, severe, pervasive, regular, repeated, and continuous.  Defendant OT

did not stop this conduct.

303.     This harassment, based upon Ms. Waterman's national origin, detrimentally affected Ms. Waterman, and was sufficiently severe or pervasive as to alter the terms and conditions of her employment and create a hostile, abusive working environment.

304.     A reasonable person would have found the harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

305.     OT's ongoing harassment of Ms. Waterman because of her national origin constitutes a discriminatory policy or practice and a continuing violation lasting until she was terminated.

306.     The acts complained of herein also constitute a continuing violation because Defendant OT had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

307.     Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant OT by reporting the discrimination to her immediate Supervisor Defendant Soravilla, and to both OT Staffing Manager Debra Hayme and Division Director Nick Saricopoulos.

308.     Defendant OT failed to exercise reasonable care to prevent and correct

promptly the harassment.

309.     The reason or reasons given by Defendant OT for permitting the termination Ms. Waterman are a pretext for national origin discrimination.

310.     As a result of defendant OT's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

311.     Since Defendant OT engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION AGAINST REGISTER.COM
### (Retaliation in Violation of Title VII)

312.     Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 300 as if separately set forth herein.

313.     By the conduct alleged in paragraphs 12-199 Defendants OT took tangible employment actions against Ms. Waterman, including permitting her termination, and consistently failing to protect her from egregiously derogatory harassment for her opposition to unlawful employment practices, namely the ongoing discrimination against her in violation of 42 U.S.C. 2000e-3.

314.     Ms. Waterman endured insults from numerous OT employees The acts

complained of herein also constitute a continuing violation because Defendant OT had notice and knowledge of the harassment Ms. Waterman was being subjected to, but permitted it to continue unremedied for so long as to amount to a discriminatory policy or practice.

315.    Defendant OT failed to exercise reasonable care to protect Ms. Waterman from such retaliation.

316.    The reason or reasons given by Defendant OT for terminating Ms. Waterman are a pretext for retaliation.

317.    As a result of defendant OT's unlawful retaliation, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

318.    Since Defendant OT engaged in discriminatory practices with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION AGAINST OFFICETEAM
### ( Race Discrimination in Violation of 42 U.S.C. 1981)

319.    Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 306 as if separately set forth herein.

320.    Ms. Waterman is an African American living, at all times, within the jurisdiction of the United States of America.

321.     Ms. Waterman was egregiously harassed and insulted based upon her race by her Employer, OT.

322.     Ms. Waterman was subjected to these harassing terms and terminated based upon her race in violation of 42 U.S.C. 1981.

323.     A reasonable person would have found the race-based harassment and discrimination Ms. Waterman experienced to be severe, pervasive, hostile and abusive, and Ms. Waterman herself subjectively found her work environment to be severe, pervasive, hostile and abusive.

324.     Accordingly, Ms. Waterman's Complaint challenges all discriminatory conduct and harassment by Defendant Soravilla and other RCOM and OT employees (and imputed to the Defendants OT) as part of the violations complained of herein.

325.     Ms. Waterman reasonably took advantage of preventive and corrective opportunities provided by Defendant OT by reporting that harassment to the requisite parties named above on a number of occasions.

326.     As a result of Defendant OT's unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

327.     Since Defendant OT engaged in and condoned discriminatory practices

with malice or with reckless indifference for Ms. Waterman's federally protected statutory rights, Ms. Waterman also requests an award of punitive damages, in an amount to be determined at trial.

## FIRST CAUSE OF ACTION AGAINST DEFENDANT SORAVILLA
**(Sex Discrimination in Violation of New York State Human Rights Law Against Daniel Soravilla)**

328.     Ms. Waterman repeats and realleges the allegations contained in paragraphs 1 through 316 as if separately set forth herein.

329.     At all relevant times, Ms. Waterman was an "employee" of RCOM for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

330.     Upon information and belief, RCOM is an "employer" for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

331.     Defendants violated the New York State Human Rights Law by discriminating against Ms. Waterman, because of her sex, in the terms, conditions and privileges of her employment as described above.

332.     Defendants' unlawful discrimination against Ms. Waterman includes, but is not limited, to harassing and terminating Ms. Waterman.

333.     Defendant Soravilla had, at all relevant times, the power to do more than carry out personnel decisions made by others; he had the power and authority to make personnel decisions, including evaluating and disciplining the employees he supervised, including Ms.

Waterman.

334.   Defendant Soravilla also actually participated in acts of discrimination against Ms. Waterman, as described herein.

335.   Accordingly, Defendant Soravilla is subject to individual liability under the New York State Human Rights Law.

336.   As a result of Defendants' unlawful discrimination, Ms. Waterman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

WHEREFORE, while reserving the right to seek additional damages as available, Ms. Waterman demands judgment against Defendants as follows:

A.   On the First Cause of Action against RCOM, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

B.   On the Second Cause of Action against RCOM, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

C.   On the Third Cause of Action against RCOM, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

D.   On the Fourth Cause of Action against RCOM, back pay and benefits and

front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    E.  On the Fifth Cause of Action against RCOM, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    F.  On the First Cause of Action against OT, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    G.  On the Second Cause of Action against OT, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    H.  On the Third Cause of Action against OT, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    I.  On the Fourth Cause of Action against OT, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    J.  On the Fifth Cause of Action against OT, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

    K.  On the First Cause of Action against Defendant Soravilla, back pay and benefits and front pay and benefits, plus compensatory damages, all in amounts to be determined at trial, as well as costs and interest;

    L.  Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
       February 16, 2005

                         LEVINE & BLIT, PLLC

                         By:_____
                            Matthew Blit (4145)
                            Attorney for Plaintiff
                         Victoria Waterman
                         Empire State Building
                           350 5th Avenue, Suite 6902
                           New York, New York 10118
                           (212) 967-3000

REGISTER.COM, INC.
575 Eighth Avenue, 11th Floor
New York, New York 10018

OFFICETEAM, INC
245 Park Avenue
New York, New York 10017

DANIEL SORAVILLA
Register.Com
575 Eighth Avenue, 11th Floor
New York, New York 10018